[No. G036259. Fourth Dist., Div. Three. Apr. 16, 2007.]

ELODIE IRVINE, Plaintiff and Appellant, v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Defendants
and Respondents.

COUNSEL

Greene, Broillet & Wheeler, Mark T. Quigley, Browne Greene; Esner & Chang, Stuart B. Esner and Andrew N. Chang for Plaintiff and Appellant.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Margaret M. Holm; Greines, Martin, Stein & Richland, Martin Stein, Feris M. Greenberger and Carolyn Oill for Defendants and Respondents.

## OPINION

**ARONSON, J.**—Elodie Irvine appeals from a judgment of the trial court dismissing her malpractice action against the Regents of the University of California, the University of California at Irvine (UCI) Medical Center, and individuals in UCI's liver and kidney transplant program, including Doctors David Imagawa, Muhammad Sheikh, and Sean Cao. Plaintiff contends the trial court erred in denying her motion to vacate a settlement agreement she reached in private mediation with defendants. She asserts the agreement was conditioned on her signing a subsequent release, which she declined to do, and that duress and fraud undercut the agreement.

We do not reach the merits of plaintiff's arguments because the trial court erred in dismissing plaintiff's action after she disputed that a final, binding settlement had been reached. We therefore reverse the judgment and remand with instructions to restore the case to the civil active list.

I

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff suffered from end-stage liver disease and polycystic liver and kidney disease. In June 1998, the UCI Division of Transplantation admitted

plaintiff to its organ transplantation program. After waiting more than four years for a liver and/or kidney transplant, plaintiff became exasperated. Her liver had grown to 15 pounds, approximately five times the weight of an average human liver, and her right kidney enlarged more than six times the normal size to 2.2 pounds. According to plaintiff, she received a second opinion from a physician outside the UCI program advising her the four-year delay was "unacceptable" and that "internal problems" at UCI "could be affecting [her] chances to obtain a transplant . . . ." Plaintiff was dismayed because defendants had "continuously assured [her] that [she] was high on the priority list to receive a transplant due to [her] serious life-threatening medical condition." In October 2002, plaintiff transferred to the transplantation program at Cedars-Sinai Medical Center in Los Angeles and received a liver and kidney transplant in December 2002.

In March 2004, plaintiff filed a first amended complaint alleging medical negligence, negligent infliction of emotional distress, fraud, and conspiracy. She alleged defendants "had been negligent by not properly monitoring her medical condition[,] including that of her liver and kidneys, by not properly assisting her to obtain the appropriate organ transplantation, by fraudulently misrepresenting her status on the transplant list and conspiring against her." Plaintiff alleged that defendants conspired to keep her low on the transplant list and granted priority to healthier patients to "increase the rate of successful transplantation" and thereby "attract more prestige, more patients, more profit and more research funding . . . ."

Plaintiff's theory throughout discovery appears to have been that UCI's physicians failed to take the necessary steps to attain priority for her in the queue maintained by the United Network for Organ Sharing (UNOS), an entity in Richmond, Virginia, that acts as a clearinghouse for distribution of organs to transplant centers throughout the United States. For example, plaintiff aimed the bulk of her discovery subpoena served on UCI at ascertaining the process defendants used to assign her transplant priority level. Plaintiff also requested discovery of all documents defendants "sent . . . to" and "received . . . from" UNOS, "including correspondence, memos and writings." Defendants produced a disk containing "massive amounts of medical records" and defense counsel later declared "under penalty of perjury . . . , *all* documents in our custody and under our control that were responsive to the subpoena served were provided to Mr. Eisenberg and his client."

Plaintiff sought and obtained discovery from UNOS concerning "[a]ny and all documents and writings including correspondence, memos and electronically stored information . . . regarding Elodie Irvine." UNOS produced computerized documents entitled "Candidate Report[s]" and "Candidate

Status Histor[ies]" that are not easily understood by a nonmedical layperson, but do not appear to indicate the number of organs UNOS offered UCI on plaintiff's behalf, or why those organs were rejected.

The parties attended a private mediation session on February 3, 2005. The session began at 9:30 a.m., and shortly before 6:00 p.m. the parties agreed to a "Stipulation for Settlement," which provided: "The case is settled for the sum total of $50,000, each side to bear own attorneys fees and costs, subject to final approval by Regents." The mediator provided a one-page settlement form on which the above terms were handwritten. The form included details of the settlement, including a typewritten statement as follows: "This document is binding on the parties and is admissible in court pursuant to [E]vidence [C]ode [section] 1123 et seq." Plaintiff and her attorney signed the settlement, as did defendants' attorney, Margaret Holm. Randall Fennig, representing UCI's risk management office, also signed the agreement "for Regents." The mediator later verified to the court that the parties' signed settlement "accurately sets forth the settlement terms reached that day."

Plaintiff notified the trial court of the settlement, and the court vacated its mandatory settlement conference scheduled for February 18, 2005. The notice of settlement form used by plaintiff stated that 45 days after any conditions in the settlement were satisfied (i.e., the Regents' approval), "the court must dismiss the case unless good cause is shown within that time why the case should not be dismissed." (See Cal. Rules of Court, rule 3.1385 [formerly rule 225].) The court set a hearing on its proposed order to dismiss the case for March 7, 2005, but plaintiff subsequently secured two continuances, to June 6, 2005, "due to the administration procedures of The Regents of the University of California in which it may take up to 3 months for the settlement to be paid." Defense counsel alerted plaintiff and the court on June 6, 2005, of the Regents' final approval, but the parties agreed to an additional extension of the proposed dismissal so the Regents could prepare the settlement check.

Earlier, on April 11, 2005, for a reason not disclosed by the record, plaintiff's counsel had sent UNOS a one-paragraph letter specifically requesting "any and all documents regarding *offers of organ transplantation which were made to or on behalf of Elodie Irvine* at any time from June 1, 1998 through December 31, 2002." (Italics added.) A manager for UNOS responded in a letter dated June 6, 2005, enclosing a four-page printout showing UNOS had made offers of approximately 40 livers or kidneys "to" plaintiff's Social Security number on specified dates. The form included a column of numeric refusal codes for each offer and, next to most refusal codes, a two- or three-word "Refusal Reason." Sample refusal reasons

included: "medical urgency," "donor size/weight," "donor age," "donor qual-ity," "positive serological tests," "abnormal biopsy," and "multiple organ transplant required."

Defense counsel tendered the Regents' $50,000 check to plaintiff in a letter to her attorney dated June 22, 2005, but plaintiff refused the check and on June 30, 2005, filed an "ex parte application" for a hearing to set aside "the conditional settlement." Plaintiff's counsel explained in his attached declara-tion: "Plaintiff has just obtained new information and documents that indi-cate[] that defendants failed to disclose relevant facts and information in discovery and if plaintiff had been aware of these omissions and misrepresen-tations, plaintiff would not have agreed to the conditional settlement."

Defense counsel responded in opposition: "UNOS governs the provision of organs to transplant institutions, and it is wholly unaffiliated with UCI Medical Center. In fact, UCI Medical Center has no ability to access UNOS documents for individuals who are not then listed as patients with UCI at the time of the inquiry. Once plaintiff was transferred to the Cedars-Sinai transplant list, privacy protections prohibited UCI Medical Center from obtaining information from UNOS about plaintiff. Consequently, by the time litigation commenced, the *only* people who could access the UNOS informa-tion relevant to plaintiff were (1) plaintiff, (2) UNOS personnel, and (3) plaintiff's Cedar[s]-Sinai doctors. The UNOS list of organs attached [by plaintiff] is a document generated by and through UNOS, not the Regents. At *all* times, plaintiff had the ability to request this information directly from UNOS."

The trial court granted plaintiff's application for a hearing and permitted plaintiff to submit a more detailed motion explaining why the court should vacate the settlement. Plaintiff argued the settlement was conditional because she "believed [it] was subject to her signing a final settlement agreement and release document . . . ." She also contended she agreed to the settlement only under duress, "due to her medical and emotional condition at the time." Finally, she asserted: "Since [her] consent to the terms of the agreement w[as] obtained by the Defendants fraudulently withholding material information, no settlement contract was created at all." Plaintiff attached her declaration describing why the atmosphere at the settlement conference, which was protracted a few extra hours, constituted duress, and also explaining: "If the information regarding multiple offers of organs had been produced, I would not have consented to the alleged settlement." Defendants submitted their opposition, which included defense counsel's declaration contradicting any claim of duress and denying discovery abuse.

At the hearing on August 17, 2005, the trial court announced its tentative decision to deny the motion to vacate the settlement. In argument, plaintiff's

counsel repeated the points in his motion and noted plaintiff was "present to answer any further questions that the court may have." Plaintiff did not proffer any testimony and the trial court heard none. Defense counsel stood on her written opposition, and the trial court concluded the settlement was not conditioned on plaintiff's signing the subsequent release and no other reason justified vacating the settlement. Because plaintiff failed to establish good cause to avoid dismissal under California Rules of Court, rule 3.1385, the court subsequently dismissed her suit on August 31, 2005, pursuant to the settlement terms. Plaintiff now appeals.

## II

### DISCUSSION

██ California Rules of Court, rule 3.1385 (former rule 225, renumbered eff. Jan. 1, 2007), requires the plaintiff or any other party seeking affirmative relief to notify the court immediately upon settlement of the case. (Rule 3.1385(a)(1).) If the settlement is unconditional, the party giving notice is required to file a request for dismissal within 45 days of settlement. (Rule 3.1385(b).) If the party giving notice fails to timely file a dismissal, "the court must dismiss the entire case 45 days after it receives notice of settlement unless good cause is shown why the case should not be dismissed." (*Ibid.*) For conditional settlements, the party giving notice must specify the date by which a dismissal is to be filed. If a dismissal is not filed "within 45 days after the dismissal date specified in the notice . . . , the court must dismiss the entire case unless good cause is shown why the case should not be dismissed." (Rule 3.1385(c).)

██ The question presented here is whether a party's allegations that no enforceable settlement has been reached constitutes good cause under California Rules of Court, rule 3.1385(b), precluding the trial court from dismissing the action. We conclude it does.

██ When a dispute arises on whether a binding settlement of a pending action has been reached, the party asserting the settlement has several options. If applicable, the proponent may use the summary procedures of a motion to enforce settlement under Code of Civil Procedure section 664.6.[1] Another option is to move for summary judgment. If a party chooses to bypass these summary procedures, the settlement proponent may amend his or her pleadings to assert the settlement, or bring a separate action for breach of contract or equitable relief. (See *Robertson v. Chen* (1996) 44 Cal.App.4th 1290 [52 Cal.Rptr.2d 264].) When the party asserting settlement prevails

---

[1] All further statutory references are to the Code of Civil Procedure.

under section 664.6, on a summary judgment motion, or at trial, the Legislature has specifically authorized the trial court to enter judgment in accordance with the agreement. (See §§ 664.6, 437c, 578 & 582.)

■ In contrast, the Judicial Council formulated California Rules of Court, rule 3.1385 as a case management tool for delay reduction, designed specifically to "assist courts in identifying inactive cases from the active cases that may require judicial attention." (1989 Drafter's Note, Deering's Ann. Codes, Rules (2006 ed.) foll. rule 225.) Although effective as a case management tool, rule 3.1385 is not intended as a means to enforce settlements. Rule 3.1385 does not purport to authorize entry of judgment in accordance with a settlement agreement, but authorizes only the dismissal of the action. Thus, as a means of settlement enforcement, it would aid only the defendants and provide the plaintiffs no effective relief.

Moreover, California Rules of Court, rule 3.1385 lacks the procedural safeguards built into other summary settlement enforcement procedures. For example, courts have strictly enforced section 664.6's requirement that the settlement agreement be either in writing and signed by the parties, or that the parties agree to the settlement in open court. Consequently, courts have rejected enforcement of settlement agreements under section 664.6 that are signed only by the parties' attorneys or are put "on the record" at a deposition. (See, e.g., *Datatronic Systems Corp. v. Speron, Inc.* (1986) 176 Cal.App.3d 1168 [222 Cal.Rptr. 658].) The California Supreme Court explained the reasons for strict enforcement of section 664.6 safeguards: "The litigants' direct participation tends to ensure that the settlement is the result of their mature reflection and deliberate assent. This protects the parties against hasty and improvident settlement agreements by impressing upon them the seriousness and finality of the decision to settle, and minimizes the possibility of conflicting interpretations of the settlement. [Citations.] [Fn. omitted.] It also protects parties from impairment of their substantial rights without their knowledge and consent." (*Levy v. Superior Court* (1995) 10 Cal.4th 578, 585 [41 Cal.Rptr.2d 878, 896 P.2d 171].) It would be anomalous indeed for a defendant to obtain dismissal under rule 3.1385 over a plaintiff's objections where the settlement would not meet the requirements of section 664.6.

■ We therefore conclude the trial court erred in dismissing the case under California Rules of Court, rule 3.1385. We note the court's error arose in large part from plaintiff's attempt to use a rule 3.1385 hearing to obtain a trial court determination that the settlement reached at the mediation was unenforceable. The only decision before the court at a rule 3.1385 hearing is whether to dismiss the case or restore it to the civil active list. By alleging a dispute over whether the parties reached a binding settlement, plaintiff

demonstrated good cause to restore the case to the civil active list. In reaching this conclusion, we have not considered whether any of plaintiff's contentions have merit.

## III

### DISPOSITION

The judgment is reversed, and the cause remanded with instructions the case be restored to the civil active list.

Bedsworth, Acting P. J., and Ikola, J., concurred.